Andrew M. Hutchison (SBN 289315)
COZEN O'CONNOR
101 Montgomery Street, Suite 1400
San Francisco, CA 94104
Telephone:  415.644.0914
Fax:   415.644.0978
Email: ahutchison@cozen.com

Attorneys for Defendant,
DOUGLAS MacMARTIN

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANE WIGINGTON dba GEOENGINEERING WATCH,<br><br>Plaintiff,<br><br>vs.<br><br>DOUGLAS MacMARTIN fka DOUGLAS MacMYNOWSKI; and DOES 1-10, inclusive.<br><br>Defendant. | Case No.:<br><br>**DECLARATION OF ANDREW M. HUTCHISON IN SUPPORT OF DEFENDANT DOUGLAS MacMARTIN'S NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT**<br><br>[*Filed concurrently with Notice of Removal*] |

## DECLARATION OF ANDREW M. HUTCHISON

I, Andrew M. Hutchison, hereby declares as follows:

1.      I am an attorney at law duly licensed to practice in the State of California and in the United States District Court for the Eastern District of California.  I am an attorney of Cozen O'Connor, counsel of record for Defendant Douglas MacMartin ("Defendant"), in the above-referenced matter.  I have personal knowledge of the matters stated below or based my knowledge on my review of the case file. As to those matters stated on information and belief, I believe them to be true. If called as a witness, I could and would testify competently thereto.

2.      Attached as **Exhibit A** is a true and correct copy of the Complaint filed in the action entitled *Dane Wigington dba GeoEngineering Watch v. Douglas MacMartin, et al.*, Case No. SC RD CV-PO-21-0198510-000, filed in the Superior Court for the State of California for the County of Shasta.

3.      Attached as **Exhibit B** is a true and correct copy of the Amended Summons filed in the action entitled *Dane Wigington dba GeoEngineering Watch v. Douglas MacMartin, et al.*, Case No. SC RD CV-PO-21-0198510-000, filed in the Superior Court for the State of California for the County of Shasta.

4.      Attached as **Exhibit C** is a true and correct copy of additional documents from the action entitled *Dane Wigington dba GeoEngineering Watch v. Douglas MacMartin, et al.*, Case No. SC RD CV-PO-21-0198510-000, filed in the Superior Court for the State of California for the County of Shasta.

5.      Attached as **Exhibit D** is a true and correct copy of the State Court Action docket.

6.      Defendant is serving a Notice to Adverse Party of Filing Notice of Removal, together with the Notice of Removal, on Plaintiff's counsel and will file these documents with the clerk of the Superior Court for the State of California for the County of Shasta.

**DECLARATION OF ANDREW M. HUTCHISON IN SUPPORT OF DEFENDANT DOUGLAS MacMARTIN'S NOTICE OF REMOVAL OF ACTION**

1    I declare under penalty of perjury under the laws of the United States that the

2    foregoing is true and correct.

3

4    Dated: December 17, 2021                    /s/ Andrew M. Hutchison

                                                 Andrew M. Hutchison

5                                                Attorney for Defendant,

                                                 DOUGLAS MacMARTIN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF ANDREW M. HUTCHISON IN SUPPORT OF DEFENDANT DOUGLAS MacMARTIN'S**
**NOTICE OF REMOVAL OF ACTION**

# EXHIBIT A

1 | Samuel C. Williams (SBN 310420)
2 | 1263 California Street
  | Redding, CA 96001
3 | Tel: (530) 255-8171
  | Fax: (530) 255-8027
4 | Email: samuel.crispan.williams@gmail.com
5 | Attorney for Plaintiff
  | Dane Wigington dba GeoEngineering Watch

**FILED**

**NOV - 5 2021**

CLERK OF THE SUPERIOR COURT
BY: S. MURILLO, DEPUTY CLERK

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SHASTA

DANE WIGINGTON dba
GEOENGINEERING WATCH,

Plaintiff,

vs.

DOUGLAS MacMARTIN fka
DOUGLAS MacMYNOWSKI, an
individual,
and DOES ONE through TEN;

Defendants.

Case No. **198510**

**COMPLAINT FOR DAMAGES
FOR DEFAMATION AND
INTERFERENCE WITH PROSPECTIVE
ECONOMIC RELATIONS**

Plaintiff Dane Wigington dba GeoEngineering Watch alleges:

### THE PARTIES

1.     Wigington is, and at all times mentioned herein was, an adult residing and working in Bella Vista, Shasta County, California. Prominently displayed on the "Home" and "Contact" pages of his website (discussed below) are his post office box address in Bella Vista. Numerous articles over the years have also referenced the fact that he is based in Shasta County. The subject documentary (also discussed below) references his home in Northern California.

2.     On information and belief, Defendant Douglas MacMartin aka Douglas

MacMynowski is, and at all times mentioned herein was, an adult who "splits his time between mechanical and aerospace engineering at Cornell University," in Ithaca, New York, and "computing and mathematical sciences at the California Institute of Technology" ("Caltech"), in Pasadena, California. On information and belief, in addition to MacMartin's many contacts with California as a professor at Caltech in California, his tortious conduct was directed at and caused injury to Wigington in Shasta County, California.

3.     Non-party Science Feedback is a self-described "not-for-profit organization verifying the credibility of influential claims and media coverage that claims to be scientific, starting with topics of climate and health." On information and belief, Climate Feedback is either a subsidiary or a dba for Science Feedback. (Hereafter, the two are simply referenced together as "Climate Feedback.")

4.     Wigington is ignorant of the names of the defendants sued herein as Does One through Ten. On information and belief, each is responsible in some manner for the tortious and other wrongful acts alleged herein.

5.     On information and belief, in doing the things hereinafter mentioned, each defendant was the agent or employee of each of the other defendants and was acting within the course and scope of such agency or employment, each defendant had knowledge of and agreed to both the objective and course of action to injure Wigington, each defendant was acting in concert with all of the other defendants, and each defendant was acting with the consent of all of the other defendants.

**CHARGING ALLEGATIONS**
**Introduction: SRM Aims to Reduce Solar Radiation**

6.     In 2010, the United Nations University's *Our World*, an award-winning web magazine which "shares expert views, research, and commentary on contemporary affairs of relevance to the mandate of the United Nations," published a piece by Clive Hamilton, the Charles Sturt Professor of Public Ethics at the Centre for Applied Philosophy and Public Ethics based at the Australian National University: *The*

*Frightening Politics of Geo-engineering* ("Hamilton").)

7.    The piece is a shorthand primer on solar radiation management aka "solar radiation modification" or "SRM," including the ease with which SRM might be implemented by a single country or rich individual without advance notice.

8.    In the piece, Hamilton explained that "[t]he cooling effect of large volcanic eruptions has been known for some time. A haze forms from the sulphur dioxide spewed into the upper atmosphere reducing the amount of solar radiation reaching the Earth." (Hamilton, *supra.*) For example, the Krakatoa eruption in 1883, "one of the most violent in history, sent a massive plume of ash into the stratosphere, turning sunsets red around the globe. The gases emitted also caused the Earth to cool by more than one degree and disrupted weather patterns for several years." (*Ibid.*) Since these observations, several patents were filed and several modelling studies were conducted exploring the possibility of using other aerosols to reflect sunlight, primarily sulfur dioxide, barium, strontium, and polymers.

9.    Hamilton then noted that:

> Now, a powerful coalition of forces is quietly constellating around the idea of transforming the Earth's atmosphere by simulating volcanic eruptions to counter the warming effects of carbon pollution. Engineering the planet's climate system is attracting the attention of scientists, scientific societies, venture capitalists and conservative think tanks. Despite the enormity of what is being proposed — nothing less than taking control of Earth's climate system — the public has been almost entirely excluded from the planning.
> (Hamilton, *supra.*)

10.    This "geoengineering," "the deliberate large-scale manipulation of the planetary environment to counteract anthropogenic climate change," Hamilton wrote, "divides methods into two types: carbon dioxide removal from the atmosphere, and solar radiation management aimed at reducing heat coming in or reflecting more of it out." (Hamilton, *supra.*) As to the latter, Hamilton observed that "[s]ome of the ideas put forward to block the Sun's heat would be far-fetched even in a science fiction novel" and cited some examples. (*Ibid.*) He then revealed the kicker:

- 3 -
Complaint for Damages

> . . . the option that is taken most seriously is altogether grander in conception and scale. The scheme proposes nothing less than the transformation of the chemical composition of the Earth's atmosphere so that humans can regulate the temperature of the planet as desired. Like volcanic eruptions, it involves injecting sulphur dioxide gas into the stratosphere to blanket the Earth with tiny particles that reflect solar radiation.
>
> Various schemes have been proposed, with the most promising being adaptation of high-flying aircraft fitted with extra tanks and nozzles to spray the chemicals. A fleet of 747s could do the job.
> (*Ibid.*)

11. "More cautious scientists," Hamilton said, "recognise that attempting to regulate the Earth's climate by enhancing global dimming is fraught with dangers ... The climate system is hugely complicated and tinkering with it might be akin to introducing cane toads to control sugarcane beetles." (Hamilton, *supra.*)

12. The temptation to try it, however, is extreme. Its cost "is estimated to be 'trivial' compared to those of cutting carbon pollution," Hamilton noted. (Hamilton, *supra.*) Thus, "[w]hile the international community has found it difficult to agree on strong collective measures to reduce carbon emissions, climate engineering is cheap, immediately effective and, most importantly, available to a single nation." (*Ibid.*) In short, "[f]iddling with the dimmer switch may prove an almost irresistible political fix for governments." (*Ibid.*)

13. In fact, according to Hamilton, as of 2010 Russia was already planning a full-scale trial; and, yet, at the same time, the debate over climate engineering was "confined largely to a tight-knit group of scientists, some of whom wanted to keep the public in the dark and fend off regulation of their activities." (Hamilton, *supra.*) Hamilton then discussed two whom he labeled "leading advocates" of climate engineering, Ken Caldeira and David Keith:

- 4 -
Complaint for Damages

David Keith argues that an international treaty may be unnecessary because the use of solar radiation management could be regulated by unwritten "norms". This is despite his acknowledgement that the threat of unilateral action is very real; any one of a dozen countries could begin it within a few years. Indeed, one wealthy individual could transform the atmosphere and, with enough determination, bring on an ice age.

Perhaps the wealthy individual he has in mind is Bill Gates, who has covertly been funding geoengineering research for three years with advice from Keith and Caldeira. They now oversee Gates' research fund, which has spent some $4.5 million to date .... Keith would not reveal what the money is being spent on, downplaying it as "a little private funding agency" ....

(Ibid.)

14.     Hamilton concluded his piece with a series of predictions, including the following: "More vivid sunsets like the one Edvard Munch saw in 1883 [that inspired his iconic painting, "The Scream"] would be one of the consequences of using sulphate aerosols to engineer the climate; but a more disturbing effect of enhanced dimming would be the permanent whitening of day-time skies. A washed-out sky would become the norm." (Hamilton, *supra*.)

**Wigington and MacMartin Have Opposing Views About SRM**

15.     Wigington has a background in solar power, but for the past 20 years has devoted substantial time, energy, and resources to researching SRM, and, specifically, the extent to which there has been an intentional effort to dim direct sunlight through aircraft-dispersed particles. Wigington is adamant that such research is the last thing he ever wanted to do, but that as a father who wants his children to have a future, he "can't not do it." In this regard, Wigington operates a sole proprietorship, GeoEngineering Watch, that investigates and publishes information regarding SRM through a website, geoengineeringwatch.org, social media, and in-person and on-air presentations. Among the things Wigington has published on the website is evidence that SRM is being implemented and is not merely a theoretical possibility. Wigington has collected a substantial quantity of pictures and film footage of jets leaving aerosols in the sky. He

1  has posted these pictures and other pieces of evidence on the website. The crown jewel

2  of Mr. Wigington's efforts was the culmination of his documentary, *The Dimming*, which

3  presented NOAA approved flying laboratory tests of jet dipersions and interviews with

4  numerous persuasive experts, scientists, and former government officials from multiple

5  countries.

6      16.    MacMartin has also researched and published material on SRM, but he

7  maintains that SRM has only been explored as a theoretical possibility.

8              **MacMartin Harbored Personal Animosity for Wigington for Years**

9      17.    Wigington and MacMartin were brought together on an email thread that

10  began in 2017, when an anti-geoengineering activist emailed MacMartin expressing

11  grave concerns about climate engineering and MacMartin's role in it.

12      18.    MacMartin responded to the email by aggressively dismissing the notion

13  that there had been any climate engineering to date and calling those who said

14  otherwise "dishonourable":

15          I am sorry that you have been so deliberately deceived, but if
           you were a decent human being you would learn the facts
16          before accusing other people of bad behaviour. [¶] I
           understand that there are some people on the planet who ...
17          are ... capable of taking pictures and posting them on
           websites; just because they know how to use a camera and
18          know how to type doesn't mean that you should trust what
           they say. Like I said, I'm sorry you've been deceived by
19          dishonourable people ....

20      19.    MacMartin was apparently referring to Wigington, because by that time

21  Wigington was well known for publishing evidence that SRM was being implemented

22  and was not just a "proposal" or mere theoretical possibility.

23      20.    On January 30, 2017, the Carnegie Council for Ethics in International

24  Affairs launched its Carnegie Climate Geoengineering Governance Initiative. Its press

25  release stated that "Scientists are exploring the possibility that climate geoengineering

26  might be needed ... to buy time or temporarily reduce global temperatures. However, at

27  present there is no comprehensive international framework to govern these

28

- 6 -
Complaint for Damages

technologies, which have planetary-wide consequences, pose many serious, unknown risks, and raise profound ethical questions."

21.    The very next day, January 31, 2017, Wigington published a multimedia article, *Exposing Faces of The Carnegie Science Criminal Climate Engineering Cover-Up*, on the GeoEngineering Watch website. The article included videos of MacMartin, Keith, and Caldeira expressing what Wigington considered to be inconsistent and inculpatory statements regarding SRM and that suggested that SRM easily could be, and already was being, implemented.

22.    One video features MacMartin and Caldeira discussing research performed in 2011 by MacMartin (published under his former last name, MacMynowski), Caldeira, and Keith.

23.    Another incorporates audio and video of Keith (echoing Hamilton above) explaining that current technology allows easy dispersion of aluminum vapor through a jet engine to deliver oxidized aluminum particulates to the stratosphere. Keith states that the cost is nominal because implementation would be so easy.

24.    Keith previously made a similar pitch on December 9, 2013, while promoting his book, *A Case for Climate Change*, on Comedy Central's *The Colbert Report*, Season 10, Episode 33.

25.    Keith's pitch has been reiterated numerous times elsewhere, too, including Smithsonian Magazine's Innovation section, on May 14, 2015, which also acknowledged the concerns of opponents:

> Harvard professor David Keith has an interesting theory for how to slow global warming. He wants to spray sulfur dioxide particles into the stratosphere to create a reflective barrier that would deflect radiation and lower global temperature. A couple of planes flying 20 kilometers above the Earth once a year could spray a fine layer of sulfuric acid, enough to reflect back 1 percent of the sun's rays.
>
> His plan is bold, and certainly not a silver bullet. It's politically loaded, hard to test and comes with unknown risks. But Keith … claims the technique would be cheap, easy, and, in conjunction with cutting carbon emissions, keep Earth's temperatures at a reasonable level.

*   *   *

.... Opponents worry about what increased levels of sulfur
dioxide, which can be toxic in high concentrations, would do
to the ozone layer and to public health. There are also
concerns that, if we were to start spraying sulfur dioxide, we
would never be able to stop, and that mitigating a glut of one
gas with another one could disturb the climate even more.
This biggest issue is that no one can accurately predict
what's going to happen. Al Gore didn't mince words when he
told the UN Climate Panel, in 2014, that geoengineering was
"insane, utterly mad and delusional in the extreme."

26.     On November 8, 2017, MacMartin delivered a statement to the Committee
on Science, Space, and Technology of the United States House of Representatives.

27.     Shortly after that, several people who witnessed or read MacMartin's
testimony, including those who claim to have detected a noticeable whitening of daytime
skies (just as Hamilton had predicted might happen after SRM), emailed MacMartin,
citing Wigington's materials and taking MacMartin to task for not stating that SRM was
ongoing and had been for years. They also added Wigington to their email threads with
MacMartin. Those email threads later grew, as MacMartin, Wigington, and others added
to them.

28.     For his part, MacMartin repeatedly took issue with Wigington's website
and accused Wigington of filling it with "deliberate misinformation" and of having no
proof that people were deliberately attempting to cool the planet with aerosols.
MacMartin was adamant that "in order to cool the planet, you'd have to get material up
to the stratosphere .... [a]nd we have no way to get material to the stratosphere" – "no
aircraft today can get there and deliver a payload, so no-one needs to worry that this is
even feasible." MacMartin also asserted that some of the people who read Wigington's
website were "the most vile hate-spewing people" he had ever encountered, that he
knew people who had received credible death threats from them. MacMartin also
accused Wigington of keeping up a "charade," and asked if Wigington was "making

1   money off of this somehow" -- as if to suggest that Wigington was running a con game

2   and cheating others out of their money.

3       29.    MacMartin also emphasized that he had reviewed Wigington's website,

4   emailed Wigington "dozens" of times, and tried to leave comments on Wigington's

5   website. On information and belief, MacMartin therefore knew or should have known

6   that Wigington resided in Bella Vista, Shasta County, California.

7       30.    As the email threads grew, so did MacMartin's vitriol. For example, on

8   November 14, 2017, in response to an email from Wigington commenting on

9   MacMartin's refusal to debate geoengineering facts in a live radio broadcast, MacMartin

10  replied, accusing Wigington of having nothing to offer but "BS" and of being "a fake" and

11  a "fraud."

12          Dane,

13          You know that I did respond to all of your questions before.
           You simply deleted all of my answers before posting the
14          exchange on your website. Because you're too much of a
           coward to let your readers know that you have nothing to
15          offer them but BS. When I attempted to comment on your
           website to make it clear that you had deliberately mis-
16          represented our conversation, you block that comment from
           your website. That is why I know that you are consciously,
17          deliberately lying. You know that I know that. You know that
           you're a fake, a fraud. You know that I know that. You're just
18          trying to hide that from everyone else. To the rest of your
           friends, does that look like someone who thinks the evidence
19          is on their side? Or someone who has something to hide?

20          *    *    *

21

22

23

24

25

26

27

28

- 9 -
Complaint for Damages

I'm not going to waste my time if you have zero interest in actually debating facts.

31.     In response to a subsequent email from a third party stating that the third party was embarrassed for MacMartin that McMartin had brought the email exchange down to such a level, MacMartin pointed to Wigington's website and underscored the fact that his dispute with Wigington was personal: "This all started because [Wigington] posted blatant lies about me, claiming that I was evil and knowingly harming people, which prompted a few dozen people to send me some of the most horrible hate-spewing crap I've ever seen in my life." MacMartin even likened it to the internet equivalent of beating up random people for fun. He then pressed on with his assertion that the "bottom line" was that geoengineering was not being deployed, that it was "just an idea, nothing more," and that it was "easy to prove with 100% certainty that no-one is deliberately cooling the planet by spraying things from aircraft."

**Wigington Debated McMartin in March 2018**

32.     Nevertheless, MacMartin later agreed to debate Wigington, and the debate took place live, on the air, on March 15, 2018, during the *In Other News* radio show hosted by Geoff Brady on WBAI 99.5 FM, New York City.

33.     MacMartin began the live, on-air radio debate by reiterating his position that no one was engaging in SRM by putting aerosols in the air and the purported reasons why:

> The reason I can say nobody is doing that is first of all nobody is even capable of doing that today, we don't have aircraft that can fly into the stratosphere, that can -- that can fly high enough and deliver a useful payload, and if anybody was doing that somehow it would be really easy to see it in satellite data.

34.     Wigington then responded by pointing out that the height of the stratosphere varies, and that in the polar regions it starts as low as 23,000 feet and that the United States has Boeing KC-135 Stratotankers that are perfectly cable of carry as

1  much as 100 tons of material as their payloads at that altitude. He also pointed out that

2  even at the mid-latitudes the stratosphere could start as low as 33,000 feet and that all

3  forms of jet aircraft can reach those altitudes.

4      35.    In reply, MacMartin backpedaled and argued that his earlier reference to

5  the stratosphere had just been shorthand for a much higher altitude, 60,000 to 80,000

6  feet. He then purported to "refine" his prior statement to mean that it was necessary to

7  get the material to this much higher altitude. MacMartin then argued that if anyone was

8  spraying aerosols from aircraft at any lower altitudes, then by definition (his, apparently)

9  they were not doing SRM but were instead doing something else.

10      36.    Wigington then pressed for clarification, "You're not really here to discuss,

11  Doug, whether or not geoengineering has been deployed? You're only here to discuss

12  whether it could, if used properly – based on the parameters that you had set for it –

13  whether it might work if those parameters were followed, but not to answer the fact that

14  it's already been deployed?"

15      37.    MacMartin answered, "I will make a statement of fact: nobody has

16  deployed a deliberate system for cooling the global climate. Other things may be going

17  on. There's no question that people do weather modification. That's a matter of public

18  record. So, one needs to be precise in one's terminology."

19      38.    When the broadcast host then asked what evidence MacMartin had for the

20  statement that no one had deployed a deliberate system for cooling the global climate,

21  MacMartin reverted to his original arguments that no one had aircraft that could get to

22  60,000 to 80,000 feet to deliver a payload and that if someone were putting material that

23  high it would appear in lots of observational records from which it was absent.

24      39.    Wigington then cited a 2011 study by the National Oceanic and

25  Atmospheric Administration ("NOAA study") that indicated aerosols were making it to

26  the stratosphere:

27          A recent increase in the abundance of particles high in the
            atmosphere has offset about a third of the current climate
28          warming influence of carbon dioxide ($CO_2$) change during

- 11 -
Complaint for Damages

the past decade, according to a new study led by NOAA and published today in the online edition of Science.

In the stratosphere, miles above Earth's surface, small, airborne particles reflect sunlight back into space, which leads to a cooling influence at the ground. These particles are also called "aerosols," and the new paper explores their recent climate effects -- the reasons behind their increase remain the subject of ongoing research.

"Since the year 2000, stratospheric aerosols have caused a slower rate of climate warming than we would have seen without them," says John Daniel, a physicist at CSD and an author of the new study.

The new study focused on the most recent decade, when the amount of aerosol in the stratosphere has been in something of a "background" state, lacking sharp upward spikes from very large volcanic eruptions. The authors analyzed measurements from several independent sources -- satellites and several types of ground instruments -- and found a definitive increase in stratospheric aerosol since 2000.

"Stratospheric aerosol increased surprisingly rapidly in that time, almost doubling during the decade," Daniel said. "The increase in aerosols since 2000 implies a cooling effect of about 0.1 watts per square meter – enough to offset some of the 0.28 watts per square meter warming effect from the carbon dioxide increase during that same period."

The reasons for the 10-year increase in stratospheric aerosols are not fully understood and are the subject of ongoing research .... Likely suspects are natural sources - smaller volcanic eruptions - and/or human activities, which could have emitted the sulfur-containing gases, such as sulfur dioxide, that react in the atmosphere to form reflective aerosol particles.

Daniel and colleagues with NOAA, CIRES, the University of Colorado, NASA, and the University of Paris used a climate model to explore how changes in the stratosphere's aerosol content could affect global climate change - both in the last decade, and projected into the future. The team concluded that models miss an important cooling factor if they don't account for the influence of stratospheric aerosol, or don't include recent changes in stratospheric aerosol levels.

40.   The graphic included with the study also emphasized that the "[s]ources of aerosols reach the stratosphere from above and below."



Sources of aerosols reach the stratosphere from above and below. Sulfur dioxide ($SO_2$), carbonyl sulfide (OCS), and dimethyl sulfide (DMS) are the dominant surface emissions which contribute to aerosol formation. Schematic: Ryan Neely, NOAA

(NOAA study, *supra.*)

41.    In response, MacMartin was adamant that the source of the increased aerosols had since been confirmed to be a series of small volcanic eruptions and again retreated to his original definitional arguments above. He also rejected the idea that aircraft flying at 35,000 to 45,000 feet could have any appreciable effects on the climate. As Wigington continued to press MacMartin, MacMartin got audibly flustered and suggested that Wigington "shut up" and listen.

42.    Shortly after that, when Wigington confronted MacMartin with the fact that MacMartin's academic collaborator Keith had repeatedly stated how cheap and easy it "would be" to accomplish an SRM program, MacMartin tried to parse verb tenses to suggest that by using "would be" Keith really only meant at some point off in the unknown future after a special aircraft existed.

43.    When Wigington then further pointed out that neither Keith nor the studies said anything like that and suggested that MacMartin was just making things up as he

1    went along, MacMartin got even more audibly excited and exclaimed, "BULLSHIT," and

2    the host had to remind MacMartin not to use profanity on air.

3        44.    The host ultimately redirected the discussion to Wigington's available

4    data, the fact that Wigington represented a large group of people with similar concerns,

5    and the fact that what these people were seeing "seems to look exactly like the

6    geoengineering operations being proposed." The host then asked MacMartin, "What do

7    you suspect people are seeing that looks almost exactly like some of the

8    geoengineering operations being proposed?"

9        45.    In response, MacMartin had no real answers. For example, MacMartin

10   could not confirm that the condensation nuclei from jet aircraft trails were additive-free.

11   MacMartin could not explain why not a single one of the 1,518 climate scientists and

12   experts Wigington had surveyed was willing to go on record and "confirm that global

13   atmospheric geoengineering programs have not yet been deployed." MacMartin

14   seemed to have no knowledge of reported studies that levels of direct sunlight reaching

15   some parts of the planet had dropped almost 20 percent in recent decades. In the end,

16   MacMartin simply did not disprove Wigington's assertion that aerosols were intentionally

17   being sprayed at altitudes lower than 60,000 to 80,000 feet.

18   **MacMartin Disparaged Wigington in Emails in October 2020**

19       46.    In October 2020, Wigington and MacMartin were brought back together on

20   yet another email thread when an anti-geoengineering activist wrote a *New York Times*

21   writer about the writer's geoengineering article quoting MacMartin. The activist cc'd

22   Wigington, MacMartin, and others. MacMartin then emailed the *Times* writer in

23   response, taking a swipe at Wigington and his supporters:

24                   I suppose I should have warned you that there's this group
       out there who have some, shall we say, interesting ideas. I
25                   don't think there's much point in responding to them as they
       generally aren't interested. I've tried... mostly it's resulted in
26                   death threats against me and my family, rather than any
       genuine attempt to discuss what is true and what is not true
27                   (kind of hard to have a meaningful conversation without any
       basis in shared realty). So I stopped bothering and they've
28                   mostly left me alone ....

1  (First ellipsis in original.)

2      47.   Wigington then politely responded with links to the debate and to a

3  preview of his then-forthcoming documentary, *The Dimming*:

4          Mr. MacMartin, perhaps you should consider telling the truth
        at some point. Did you forget that you and I have already

5          had a live on-air moderated debate of the facts surrounding
        the climate engineering reality? I will let the listeners decide

6          who had their facts straight and who didn't. .... [¶] Global
        climate engineering operations will soon be exposed ... and

7          you along with them.

8

9      48.   MacMartin then replied with more personal attacks, including:

10          Hi, Dane, [¶] ... I know that you feel like you need to perform
        for your audience .... you know you're making stuff up .... [¶]

11          .... it's pretty clear that truth is not something that is
        important in your value system / moral framework.

12

13  **MacMartin "Fact-Checked" Wigington's Documentary in March 2021**

14

15      49.   In the meantime, Wigington and his science team continued their

16  investigations and completed *The Dimming* – the documentary previewed in the link

17  sent to MacMartin back in October 2020. The finished product was a detailed work that

18  was nearly two hours long.

19      50.   The documentary features scientific data, historical records, photographs,

20  videos, anecdotes, commentary, and analyses from more than a dozen people,

21  including:

22      •    Allan Buckman, former United States Air Force
weather observer, California Department of Fish and Game
wildlife biologist.

23

24      •    David O. Carpenter, Ph.D., Director/M.D., Institute for
Health and the Environment, Professor of Environmental

25  Health Sciences, University at Albany, State University of
New York.

26      •    Kristen Meghan Edwards, former United States Air
Force, bioenvironmental engineering industrial hygienist.

27

28

- •    Catherine Austin Fitts, former Presidential Cabinet Member for George H.W. Bush.

- •    Paull Hellyer, former Canadian Minister of Defense.

- •    Charles Jones, United States Air Force Brigadier General (Ret.), former tactical weather reconnaissance pilot.

- •    Dietrich Klinghardt, Ph.D., M.D. Founder, Sophia Health Institute.

- •    Francis Mangels, former United States Forest Service biologist.

- •    Mark McCandlish, former defense industry technician.

- •    Jeff Nelson, former commercial airline pilot.

- •    Richard H. Roellig, United States Air Force Major General (Ret.).

- •    Iraja Sivadas, Member, Union of Concerned Scientists.

- •    Bill Vander Zalm, former Premier of British Columbia.

- •    A geomicrobiologist, identity withheld.

51.    The documentary explores the evidence that SRM could be, and already is being, implemented.

52.    Wigington and his science team also tested air samples at altitude on both the East Coast and the West Coast. First, they acquired a NOAA flying laboratory on the East Coast, tested air samples at altitude from the induced layer created by aircraft contrails, and found the exact same elements listed in geoengineering patents. Then, on the West Coast, they conducted additional sampling via Learjet, and were able to confirm the presence of nanoparticles in the plane's cabin air being drawn from the induced layer. The documentary summarized these findings as well as the evidence that these same nanoparticles were showing up in and affecting the soil, the oceans, the food chain, and even our bodies, and that the only source of these particles was the air.

53.    The documentary also explained that through compartmentalization, nondisclosure agreements, gag orders, and other means and circumstances, SRM did not require a "vast conspiracy" of thousands, but rather only an unknowing aggregate of people just doing their jobs.

54.    The express purpose of the documentary is to raise a critical mass of awareness so that more and more people consider the known facts and continue to press for additional facts until everything is revealed and appropriate mitigation can be implemented. Wigington hopes the documentary will finally set in motion the pebble that causes the landslide of awakening. On March 10, 2021, he published the documentary on YouTube and Facebook.

55.     However, on about March 25, 2021, Climate Feedback, a third-party "fact-checker" for Facebook, published its purported review ("Review") of the documentary. The substance of the Review is as follows:

56.



CLAIM

"The intentional dimming of direct sunlight by aircraft dispersed particles, a form of global warming mitigation known as 'Solar Radiation Management', has and is causing catastrophic damage to the planet's life support systems"

SOURCE: Dane Wigington, Geoengineering Watch, 10 March 2021

VERDICT 



Method

See how we rate claims

Reviewers

 Douglas MacMartin
Senior Research Associate, Cornell University

Editor

N&H Forrester
Science Editor, Climate

DETAILS

Incorrect: Aircrafts produce contrails when water vapor from jet exhaust condenses at high altitudes. Scientists agree that there is no evidence of chemtrails or solar geoengineering.

KEY TAKE AWAY

 Solar geoengineering describes hypothetical strategies to combat global warming by reflecting sunlight away from the Earth. There is no scientific evidence that solar geoengineering is happening or having catastrophic effects on the planet or human health. There is also no scientific evidence of aircraft chemtrails. Instead, aircrafts produce contrails when water vapor from jet exhaust mixes with the atmosphere and condenses at high altitudes.

Support our work

We depend on your support to operate. Help us create a more trustworthy internet.

 Donate

REVIEW

CLAIM: "Global climate engineering operations are a reality. Atmospheric particle testing conducted by GeoengineeringWatch.org has now proven that the lingering, spreading jet aircraft trails, so commonly visible in our skies, are not just condensation as we have officially been told. ... The intentional dimming of direct sunlight by aircraft dispersed particles, a form of global warming mitigation known as 'Solar Radiation Management', has and is causing catastrophic damage to the planet's life support systems. The highly toxic fallout from the ongoing geoengineering operations is also inflicting unquantifiable damage to human health."

## REVIEW

The claims that climate engineering is happening and causing catastrophic damage to the planet's life support systems was published in a YouTube video by Dane Wigington of Geoengineering Watch. The video received more than 155,000 views, as of 24 March 2021. These claims were also repeated in an article published by Health Impact News.

The video incorrectly claims that climate engineering is happening and that jet aircraft trails are not condensation, but dispersed particles that dim direct sunlight to mitigate the effects of global warming. Claims such as these are often referred to as "chemtrails". Contrary to these claims, atmospheric chemists and geochemists agree that there is no scientific evidence of "chemtrails", "covert geoengineering", or a secret large-scale atmospheric program to mitigate climate change[1].

Aircraft engines produce condensation trails, or contrails, as hot, humid exhaust mixes with the atmosphere at altitudes of 8 – 13 km. Specifically, water vapor from the jet exhaust condenses and may freeze at high altitudes, where there is a lower vapor pressure and temperature than the exhaust. As described in a Scientific American article, "this mixing process forms a cloud very similar to the one your hot breath makes on a cold day".

A 2018 study provides additional details about the process of contrail formation, "Depending on surrounding atmospheric conditions, contrails can be short- or long-lived. Long-lived contrails are those that remain for at least 10 min—defined by the World Meteorological Organization as Cirrus homogenitus—and are the only man-made type of ice clouds".[2] As Doug MacMartin notes below, contrails are essentially artificial cirrus clouds, which are wispy, hair-like clouds found at high altitudes.

The video also claims that Solar Radiation Management (SRM) "has and is causing catastrophic damage to the planet's life support systems". SRM, or solar geoengineering, describes hypothetical strategies to combat global warming by reflecting sunlight away from the Earth. "Possible methods include reducing heat-trapping clouds, sending a giant sunshade up into orbit or releasing aerosols into the stratosphere," according to a Carbon Brief article.

While some studies suggest that SRM could negatively impact biodiversity, which subsequently affects human health, others find that some of the risks of solar geoengineering can be minimized[3,4]. Currently, conversations about SRM strategies, or albedo modification, are purely theoretical. "We are confident that there is no currently active program to actually test or implement albedo modification outdoors," wrote David Keith. Therefore, the video's claims that SRM is happening and causing catastrophic damage are also incorrect.

Complaint for Damages

## SCIENTISTS' FEEDBACK

**Douglas MacMartin, Senior Research Associate, Cornell University:**
All of these claims are pure fantasy. The alternative hypothesis to their supposed conspiracy (which would require cooperation from hundreds of thousands of people in every single country on the planet) is the rather mundane belief that clouds are made of water, and since jet fuel is hydrocarbon, burning it produces water vapour as well as cloud condensation nuclei, and thus produces contrails; basically an artificial cirrus.

The SRM for global warming mitigation would involve putting things like sulfate (which wouldn't leave trails) much higher into the atmosphere than any current aircraft can fly. If that was being done, it would be trivially detectable from satellite observations. We also know with 100% certainty that (a) the aircraft contrails they see aren't geoengineering, and (b) no-one is doing geoengineering.

REFERENCES:

• 1 – Shearer *et al.* (2016) Quantifying expert consensus against the existence of a secret, large-scale atmospheric spraying program. *Environmental Research Letters.*
• 2 – Kärcher (2018) Formation and radiative forcing of contrail cirrus. *Nature.*
• 3 – Trisos *et al* (2018) Potentially dangerous consequences for biodiversity of solar geoengineering implementation and termination. *Nature Ecology & Evolution.*
• 4 – Parker and Irvine (2018) The Risk of Termination Shock From Solar Geoengineering. *Earth's Future.*

🏷 Chemtrails  Geoengineering  Solar Radiation Management

Published on: 25 Mar 2021 | Editor: Nikki Forrester

(Review, *supra.*)

57. As indicated, the Review tags the following claims with a giant all-caps scarlet "INCORRECT":

> Global climate engineering operations are a reality.
> Atmospheric particle testing conducted by
> GeoengineeringWatch.org has now proven that the lingering,
> spreading jet aircraft trails, so commonly visible in our skies,
> are not just condensation as we have officially been told. ...
> The intentional dimming of direct sunlight by aircraft
> dispersed particles, a form of global warming mitigation
> known as "Solar Radiation Management", has and is causing
> catastrophic damage to the planet's life support systems.
> The highly toxic fallout from the ongoing geoengineering
> operations is also inflicting unquantifiable damage to human
> health.

(Ellipsis by the Review.)

58. However, the only "reviewer" was MacMartin; and, based on the text of his review, it does not appear that he even watched the documentary, much less considered any of the information in it. For example, the primary foundation for his assertion that the foregoing claims are incorrect is a five-year-old letter. (See Review, *supra*, fn. 1.) The letter sprang from the same cabal of SRM academics that Wigington

Complaint for Damages

1   has been challenging for years. One of its co-authors is even one of MacMartin's own
2   academic collaborators, Caldeira. In addition, although the letter took aim at purported
3   claims by Wigington and others back in 2016, the letter only did so via surveys, not
4   actual research and investigation, and the letter certainly did not consider –and could
5   not have considered – the air samples and other information in the 2021 documentary.

6       59.    The secondary support for MacMartin's assertion is an undated quote
7   from a blog by one of his other academic collaborators, Keith, who apparently likewise
8   did not consider anything in the 2021 documentary when he made the blog post. (See
9   Review, *supra*, "wrote David Keath [*sic*]" hyperlink.)

10      60.    On information and belief, the following in this paragraph. The Review is
11  the only "fact-check" review that MacMartin has ever done for Climate Feedback or any
12  other so-called "independent fact-checkers." Climate Feedback did not contact him to
13  do the Review. Instead, he contacted Climate Feedback to do it. He did not do the
14  review out of any sincere desire to evaluate the documentary's claims or to educate the
15  public. Instead, he did it to retaliate against Wigington. At no point before he submitted
16  the Review for publication, did he reveal to Climate Feedback the lengthy history he had
17  with Wigington. Further, he has a vested, financial interest in his assertions that
18  Wigington's claims "are pure fantasy" and that "[w]e also know with 100% certainty that
19  (a) the aircraft contrails they see aren't geoengineering, and (b) no-one is doing
20  geoengineering," because, among other things, he is operating under a $1 million grant
21  for SRM work. As a result of the foregoing, the Review is a gross violation of Climate
22  Feedback's mission statement to be "pedagogical" and "nonpartisan."

23      61.    According to Facebook's "fact-checking" program:

24          a.      Facebook's "fact-checking partners" like Climate
                    Feedback are given a range of "rating options," from "TRUE"
25                  all the way down to "FALSE."

26          b.      Facebook then applies that label "to content that's
                    been reviewed by fact-checking partners, so people can
27                  read additional context," and Facebook will "also notify
                    people before they try to share this content, and people who
28                  have shared it in the past."

c.      "Once a fact-checker rates a piece of content as False ... it will appear lower in News Feed, be filtered out of Explore on Instagram, and be featured less prominently in Feed and Stories. This significantly reduces the numbers of people who see it." Facebook also "rejects ads with content that has been rated by fact-checkers."

d.      Moreover, "[p]ages and websites that repeatedly share misinformation rated False or Altered will have some restrictions, including having their distribution reduced. They may also have their ability to monetize and advertise removed, and their ability to register as a news Page removed for a given time period."

62.    As a result of the Review, Wigington's documentary has been tagged with a disparaging "FALSE" label on Facebook. When someone goes to his Facebook page, and tries to view his post from March 10, 2021, the link to *The Dimming* on YouTube is grayed-out and unavailable, and in its place glowers the following warning:



- 22 -

63. If "See Why" is selected, the following pop-up window appears:

**False**                                                    ✕

Fact-Check from Science Feedback

Science Feedback  **Fact-Check**
Solar geoengineering isn't happening or damaging the planet;
aircraft contrails are formed by water vapor, not chemicals

**About This Notice**

Independent fact-checkers say this information has no basis in fact.

Learn more about how Facebook works with independent fact-checkers to stop the spread of false information.

64. In addition, down at the bottom of the Facebook post is a special "Related Articles" section that excerpts and links back to the Review:

## Related Articles

Science Feedback  **Fact-Check**
Solar geoengineering isn't happening or damaging the
planet; aircraft contrails are formed by water vapor, not...
Solar geoengineering describes hypothetical strategies ...

Similarly, when someone tries to view Wigington's Facebook post from a year earlier, March 10, 2020, which includes a link to a preview of the documentary, that post is likewise plastered with the above disparaging "false information" badging.

### MacMartin's "Fact-Check" Has Damaged Wigington

65. As a researcher who relies heavily on Facebook to communicate with his audience, Wigington has suffered irreparable reputational and financial harm as a result of MacMartin's false statements and the curtailing effects of his Review.

66. Wigington relies heavily on Facebook to communicate with his audience. As of the date of this complaint, he has approximately 13,353 followers on his Facebook profile, 55,704 on his Facebook fan page, 50,978 followers of the Facebook Fan Page

1   for GeoEngineeringWatch.org, 129,813 followers of the GeoEngineeringWatch.org

2   photo gallery, 6,186 followers for "The Dimming" fan page, for a total of 256,034 total

3   follows and 127,000 YouTube subscribers. Those followers and subscribers and others

4   in turn share his posts.

5          67.    On information and belief, many would-be viewers of the documentary

6   have chosen not to view it and other Facebook posts and videos of Wigington's, after

7   seeing that the documentary had been labeled "False" by Facebook. MacMartin thereby

8   reduced the distribution of Wigington's documentary and posts and limited the number

9   of individuals who will see Wigington's content on Facebook and YouTube.

10         68.    In fact, as noted in the Review itself, Wigington's documentary had

11  already accumulated "more than 155,000 views" on YouTube by March 24, 2021, just

12  two weeks after it was first posted on Facebook and YouTube. In the six months since

13  then, it has only received an additional approximately 207,000 views. In contrast, one of

14  Wigington's preliminary YouTube videos received more than 2.5 million views. Even

15  after removal of some of Wigington's content, he still has nearly 500 videos posted on

16  YouTube. Since the falsity badging was instituted, GeoengineeringWatch's Facebook

17  shares have declined 90%.

18         69.    The reduced viewership for Wigington's documentary resulted in reduced

19  donation revenue, which revenue Wigington otherwise would have received and relies

20  on for ongoing research. Moreover, pursuant to Facebook's policy on flagged content,

21  Wigington was essentially prohibited from re-posting the documentary (which he

22  otherwise would have done, in line with his standard practice), which would have

23  resulted in at least another 500,000 views and the monetization revenue from those

24  views.

25         70.    In addition, immediately after the "False" label was attached to the

26  documentary, there was a dramatic drop in viewership of the documentary as well as

27  Wigington's other videos. Monetization of Wigington's videos also declined substantially

28

after the falsity badging. Mr. Wigington has been running Geoengineering Watch for many years, but *The Dimming* constituted the crown jewel of his ongoing investigation. His damages are significantly higher than historical data alone would indicate.

71.   Wigington asked MacMartin to retract the Review in two separate certified letters, both of which were signed for, but MacMartin failed to respond to either letter or retract the Review. A copy of a letter sent certified mail is attached as Exhibit 1.

## FIRST CAUSE OF ACTION
### [For Defamation Per Se, by Wigington Against All Defendants]

72.   Wigington realleges paragraphs 1 through 70.

73.   In the Review, MacMartin made the following statements:

- All of these claims are pure fantasy.

- We also know with 100% certainty that (a) the aircraft contrails they see aren't geoengineering, and (b) no-one is doing geoengineering.

74.   MacMartin made these statements to persons other than Wigington. He made them to Climate Feedback and then to the public at large in California and elsewhere when Climate Feedback published the Review with his permission and cooperation.

75.   People to whom the statements were published reasonably understood that the statements were about Wigington. Indeed, the Review included a photograph of his face.

76.   People to whom the statements were published reasonably understood the statements to mean that Wigington was either delusional or a con artist.

77.   The statements were false, and MacMartin knew the statements were false or had serious doubts about the truth of the statements.

78.   Simply put, "[a]ll of these claims are [not] pure fantasy." The documentary lays out the evidence that "global climate engineering operations are reality." It summarizes the atmospheric particle testing that Wigington's team of trained and

1  certified scientists performed that indicate that "the lingering, spreading jet aircraft trails,

2  so commonly visible in our skies, are not just condensation as we have officially been

3  told." It also summarizes the evidence that "[t]he intentional dimming of direct sunlight

4  by aircraft dispersed particles" "has and is causing catastrophic damage to the planet's

5  life support systems," and that "[t]he highly toxic fallout from the ongoing

6  geoengineering operations is also inflicting unquantifiable damage to human health."

7  The Review does not address any of this. Instead, it offers only ipse dixit and citations

8  to materials that predate and do not consider the information in the documentary. For

9  these same reasons, it likewise is not true that "[w]e also know with 100% certainty that

10  (a) the aircraft contrails they see aren't geoengineering, and (b) no-one is doing

11  geoengineering."

12       79.    The foregoing conduct by MacMartin was a substantial factor in causing

13  the following harm to Wigington: harm to his occupation, expenses he had to pay as a

14  result of the defamatory statements, harm to his reputation, and shame, mortification,

15  and mental anguish, all in an amount to be proved, but not less than $74,999.00

16       80.    MacMartin is guilty of oppression, fraud, and malice with respect to the

17  foregoing conduct. As a result, Wigington is entitled to recover exemplary and punitive

18  damages to be proved.

19                    **SECOND CAUSE OF ACTION**
      **[For Defamation Per Quod, by Wigington Against All Defendants]**
20

21       81.    Wigington realleges paragraphs 1 through 79.

22       82.    Because of the facts and circumstances known to the readers of the

23  statements, they tended to injure Wigington in his occupation, and to expose him to

24  hatred, contempt, ridicule, and shame, and to discourage others from associating or

25  dealing with him.

                     **THIRD CAUSE OF ACTION**
26  **[For Intentional Interference with Prospective Economic Relations,**
           **by Wigington Against All Defendants]**
27

28       83.    Wigington realleges paragraphs 1 through 80.

84. Wigington and Facebook were in an economic relationship that probably would have resulted in an economic benefit to Wigington beyond that which Wigington was already receiving from it.

85. MacMartin knew of Wigington's relationship with Facebook.

86. MacMartin wrote the defamatory Review that does not address any of the information in the documentary and instead offers only ipse dixit and citations to materials that predate and do not consider the information in the documentary.

87. By writing the Review, MacMartin intended to disrupt Wigington's relationship with Facebook or knew that disruption of the relationship was certain or substantially certain to occur.

88. Wigington's relationship with Facebook was disrupted.

89. The foregoing conduct by MacMartin was a substantial factor in causing harm to Wigington, all in an amount to be proved, but not less than $74,999.

90. MacMartin is guilty of oppression, fraud, and malice with respect to the foregoing conduct. As a result, Wigington is entitled to recover exemplary and punitive damages according to proof.

## FOURTH CAUSE OF ACTION
### [For Negligent Interference with Prospective Economic Relations, by Wigington Against All Defendants]

91. Wigington realleges paragraphs 1 through 83, 85, and 87 through 88.

92. MacMartin knew or should have known of Wigington's economic relationship with Facebook, and MacMartin also knew or should have known that this relationship would be disrupted if he failed to act with reasonable care.

93. MacMartin failed to act with reasonable care.

94. He engaged in the foregoing wrongful conduct by writing the Review.

Complaint for Damages

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dane Wigington dba GeoEngineering Watch prays judgment in his favor and against Defendants Douglas MacMartin fka Douglas MacMynowski and Does One through Ten as follows:

1.   On the First Cause of Action for Defamation Per Se: for general and special damages as a result of the harm to Wigington (i.e., the harm to his occupation; expenses he had to pay as a result of the defamatory statements; harm to his reputation; and shame, mortification, and hurt feelings), all in an amount to be proved, but not less than $74,999; for prejudgment interest as appropriate; for punitive and exemplary damages in an amount to be determined at trial; for costs of suit herein; and for such other and further relief as may be just and proper.

2.   On the Second Cause of Action for Defamation Per Quod: the same as requested above on the First Cause of Action.

3.   On the Third Cause of Action for Intentional Interference with Prospective Economic Relations: for general and special damages as a result of the harm to Wigington, all in an amount to be proved, but not less than $74,999; for prejudgment interest as appropriate; for punitive and exemplary damages in an amount to be determined at trial; for costs of suit herein; and for such other and further relief as may be just and proper.

4.   On the Fourth Cause of Action for Negligent Interference with Prospective Economic Relations: the same as requested above on the Third Cause of Action, not including punitive and exemplary damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial as provided by the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure.

Dated: November 5th, 2021

SAMUEL C. WILLIAMS

Attorney for Plaintiff Dane Wigington dba
GeoengineeringWatch.org

## VERIFICATION

I, Dane Wigington, am the plaintiff in the above-entitled action; I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: November 5, 2021

Plaintiff Dane Wigington dba
GeoengineeringWatch.org

- 29 -
Complaint for Damages



# GOMEZ LLC

ATTORNEY AT LAW

Julio C. Gomez, Esq.

908.789.1080 Tel
908.789.1081 Fax
jgomez@gomezllc.com

July 8, 2021

VIA CERTIFIED MAIL
RETURN RECEIPTS REQUESTED
No. 7018-2290-000-7403-3068
Douglas MacMartin
Senior Research Associate/Senior Lecturer
Sibley School of Mechanical and Aerospace Engineering
Cornell University                                    No. 7018-2290-000-7403-3051
130 Upson Hall                                        11 Leifs Way
Ithaca, NY 14853                                      Ithaca, NY 14850

*Re:*    *Censorship of GeoengineeringWatch.Org*

Dear Mr. MacMartin:

I represent Geoengineeringwatch.org ("GW") and Mr. and Mrs. Dane and Jovyde Wigington, founders of and leading researchers for GW, and producers of *The Dimming*, a documentary on the subject of geoengineering. I write to notify you that Facebook has flagged and censored GW's Facebook page and the documentary based upon your misconduct and misrepresentations as a purported "Fact Checker" working in association with Science Feedback. GW and the Wigingtons have reason to believe that your actions were deliberately intended to cause Facebook to censor or delete GW's content and the documentary from public dissemination and scientific discourse and that you undertook your actions in part out of malice and out of a desire to redirect traffic from GW to Science Feedback.

As a result, the purpose of this letter is to put you on notice that my clients have good faith reasons to believe that your actions have interfered with GW and the Wigingtons' contract with Facebook, your conducted constitutes interference with their contract and prospective economic advantage under New York law and is defamatory. Your misrepresentations to Facebook have interfered with their dissemination of scientific theory and information on the Facebook page and platform and especially monetization of their documentary, *The Dimming*, on this and potentially other social media platforms. I write to inform you that GW and the Wigingtons are considering legal action against you for tortious interference with contract, tortious interference with prospective economic advantage under New York law, and potentially defamation of character as a result of your conduct and misrepresentations to Facebook.

Pursuant to Facebook's policies, GW and the Wigingtons have the option to contact you and resolve this matter directly with you to communicate with Facebook directly concerning this matter and resolve it before they take any further action within Facebook or pursue other legal options available to them against you. For the reasons stated below GW urges you to contact Facebook and request that it release the flag on the GW Facebook page and especially upon *The Dimming* documentary.

1451 COOPER ROAD
SCOTCH PLAINS, NJ 07076

As you may or may not be aware, GW has been in existence for more than a decade, since 2009. The total number of visitors to GW since it started keeping track in 2012 is more than 37 million. GW's Facebook page, since 2012, has more than 51,000 followers. The *Why in the World Are They Spraying* Facebook Page has more than 79,000 followers. The GW Photo Gallery boasts more than 131,000 followers. All of these sites and posts were created by the Wigingtons and their content is subject to copyright protection under federal law.

The content on GW and its affiliate pages constitutes free speech protected by the First Amendment and every state constitution, including New York's. Under New York law GW and the Wigingtons have a right to publish this content on their website, to use social media platforms and to enter freely into contracts with the operators of such platforms to disseminate information to the public. You have no right to interfere with their free exercise of these rights.

The Wigingtons have dedicated an extraordinary amount of time, energy and financial resources to publish content on the GW website, to disseminate it through social media platforms such as Facebook, YouTube, among others, and to maximize and monetize that dissemination through contractual agreements with companies who operate these platforms. These contracts permit the Wigingtons the option to monetize their content based on the number of visitors to their sites. Additionally, the Wigingtons go to great lengths to ensure that the content on the website is sourced and that there are verifiable, reproducible and reliable observations and scientific bases for their assertions. You may disagree with the inferences or conclusions they draw from their observations and or scientific analysis, and you may question or voice your opinion or critique their work on platforms you choose to use or in the public domain, but you have no right to censor, persuade anyone to censor, or otherwise interfere with GW's contracts with third parties or the prospective economic advantage they can gain from these efforts by misrepresenting and giving the false impression that you have checked their methodology, attempted to reproduce their results or conducted your own scientific experiment to confirm your views or rebut theirs. You clearly have not.

In fact GW suspects that you have done absolutely nothing to replicate the results of their experiments or conducted your own independent testing to verify or dispute anything stated on their sites or in *The Dimming*, nevertheless, you have communicated with Facebook, and likely others, either individually or through your association with Science Feedback, and given the false impression that you have done so, given the false impression that everything on the GW site and the documentary *The Dimming* is false and that the Wigingtons are liars and should be censored or gagged on social media platforms from disseminating their views and information to a discerning public that is more than capable of assessing the accuracy of their content or the efficacy of their scientific conclusions.

Upon information and belief, on or about March 25, 2021, you published an article entitled, "Solar engineering isn't happening or damaging the planet; aircraft contrails are formed by water vapor, not chemicals." In that article you state that a video published on YouTube (presumably *The Dimming* documentary) by Dane Wigington of GeoengineeringWatch "incorrectly claims that climate engineering is happening and that jet aircraft trails are not condensation, but dispersed particles that dim direct sunlight to mitigate the effects of global warming." You further assert that

the claims in the documentary are "pure fantasy," yet you did nothing to discuss this matter with anyone interviewed in the video, nor attempt to replicate any of the experiments or observations in the video. Without doing so, you then contacted Facebook with the intent that Facebook flag or block this content from further dissemination, thus causing Facebook to breach its contract with the Wigingtons, causing interference with their prospective economic advantages and causing prejudice to their reputation. Such conduct does not qualify as "fact-checking" under Facebook's policies or the Code of Principles published by the International Fact-Checking Network (IFCN).

You purport to rely on four sourced materials for your propositions, yet none of them addresses the *The Dimming* per se, the persons appearing in that documentary or the experiments and observations depicted in that documentary which you claim to debunk. Upon information and belief, you then used your status as a purported "Fact Checker" for Facebook, in association with Science Feedback, and proceeded to communicate with Facebook to brand *The Dimming* documentary as false, GW's content as falsehood, and Dane Wigington as a perpetrator of misinformation -- again without undertaking any effort to actually fact-check any specific data point contained therein or in his specific work.

The Wigingtons expected that as a scientist you would at least try to replicate the experiments in the video to ascertain whether they are capable of yielding data that supports the claim, or actually did yield such data, especially since the science of Solar Radiation Management as you well know, contemplates dispersal of chemical particles into the upper atmosphere (*e.g.* aluminum oxides sulfate-based aerosols)[1], patents for techniques and dispersal equipment have been filed with the U.S. Patent and Trademark Office[2], and elevated levels of aluminum, barium, and other associated elements have been detected across the country even in remote areas, according to Dane Wigington and GW who possesses such data and lab analyses. *See e.g.* Shearer, C. *et al.* "Quantifying *expert consensus against the existence of a secret, large scale atmospheric spraying program*" Environ. Res. Lett. 11 (2016) 129501, cited by you.

Moreover, you conveniently omit in your discussion – and presumably omitted from your communications with Facebook – that a number of scientists surveyed in one of the source material articles you cite, entitled, "*Quantifying expert consensus ...*", specifically stated that they were unsure how to interpret data of elevated levels of suspected chemical elements in lab samples (particularly certain snow-surface samples) and "one expert (4%) said the results may be evidence of a SLAP" (a secret, large scale atmospheric spraying program). In fact, to the Wigingtons' knowledge you have never explained to Facebook that there are in fact lab results that scientists surveyed do not know how to interpret or explain when it comes to this subject. On the contrary, you have given the *false* impression to Facebook that science is settled on this issue and that there is nothing further to investigate or explain. Such poor scientific inquiry and lethargic scientific curiosity does not befit someone of your purported status or caliber. Moreover, there is a growing

---

[1] *See e.g.* Effiong, U.; Neitzel, R.L. "Assessing the direct occupational and public health impacts of solar radiation management with stratospheric aerosols". Environmental Health (2016) 15:7; Rasch, P. J.; Tilmes, S.; Turco, R. P.; Robock, A.; Oman, L.; Chen, C.; Stenchikov, G. L.; Garcia, R. R. "An overview of geoengineering of climate using stratospheric sulphate aerosols". Philosophical Transactions of the Royal Society of London. Series A, Mathematical and Physical Sciences. 366 (2008): 4007–4037.

[2] *See e.g.* U.S. Patent No. 5,003,186 (Stratospheric Welsbach Seeding For Reduction of Global Warming); U.S. Patent No. 7,819,362 B2 (Enhanced Aerial Delivery System)

body of literature that dispersals from aircraft, whether part of a clandestine geoengineering program, or not (e.g. aircraft emissions) are having unintended consequences on the environment.

As a result of such poor scientific rigor, the Wigingtons have reason to believe that your intention was not to engage with these issues or the claims raised in the video, your intention was not to advance scientific study, scientific discourse or debate, but to simply smear and deride Mr. Wigington out of malice, censor him from disseminating his views and scientific work, and re-direct traffic to you and to websites upon which you appear. Such actions are illegal.

A legal claim and lawsuit for tortious interference under New York law arises from "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages." *See Foster v. Churchill*, 87 N.Y.2d 744, 749-750 (Ct. App. 1996). A valid contract between the Wigingtons and Facebook exists; you were aware of that contract and relationship between them; you intentionally procured Facebook's decision to flag and censor GW in breach of their contract; and the Wigingtons have suffered damages in the form of reduced monetization of their site and curtailment of their rights thereunder.

Even in the absence of contract New York law also recognizes a legal claim for tortious interference with prospective contractual or business relations. *See e.g. Smith v. Meridian Techs, Inc.*, 861 N.Y.S.2d 687 (App. Div. 2d Dept. 2008). "To prevail on a claim for tortious interference with business relations in New York, a party must prove (1) that it had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and (4) that the defendant's interference caused injury to the relationship with the third party." *See Amaranth LLC v J.P. Morgan Chase & Co.*, 888 N.Y.S.2d 489, 494-495 (App. Div., 1ˢᵗ Dept. 2009). Again, in this case, the Wigingtons had a business relationship with Facebook; you knew of the existence of the business relationship and you intentionally interfered with it; you acted solely out of malice and used improper means (half-truths, fraud and misrepresentations) to interfere; and your actions have caused the Wigingtons injury. These precedents support the proposition that the Wigingtons may sue you for wrongful conduct that arises from your *"fraud or misrepresentation"* and *"degrees of economic pressure"* caused by you. *See id.*

Finally, defamation "is defined as the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *See Foster v. Churchill*, 87 N.Y.2d 744, 751 (Ct. App. 1996). Moreover, "[d]efamation is a predicate wrongful act for a tortious interference claim." *See Amaranth LLC v J.P. Morgan Chase & Co.*, 888 N.Y.S.2d 489, 494-495 (App. Div., 1ˢᵗ Dept. 2009).

"It is well settled that where a statement impugns the basic integrity or creditworthiness of a business, an action lies and injury is conclusively presumed." *Id.* Upon information and belief your communications with and assertions to Facebook have impugned the basic integrity of GW and the Wigingtons and caused them injury. By disparaging GW and Dane Wigington specifically you have interfered with their rights. And as a purported "Fact Checker" you knew what the

Douglas MacMartin
July 8, 2021
Page 5 of 5

consequences of your actions would be and you proceeded callously, recklessly and deliberately to censor and injure GW and the Wigingtons.

They urge you to contact Facebook and redress this wrong. You have the ability under Facebook's policies to persuade Facebook to lift the flag on GW's website and *The Dimming* that is preventing dissemination. You are in the unique position of directing Facebook to stop censoring the Wigingtons' views and allowing scientific discourse and debate to continue. They are not asking you to change your views or to be silenced as they have been.

The Wigintons trust that you will be guided accordingly; they await your prompt response or action within ten (10) business days.

Respectfully,

Julio C. Gomez

*Counsel for Geoengineering Watch.Org and Dane and Jovyde Wigington*

# EXHIBIT B

*Amended*

# SUMMONS
## *(CITACION JUDICIAL)*

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

DOUGLAS MacMARTIN fka
DOUGLAS MacMYNOWSKI, an individual, and DOES ONE through TEN

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

DANE WIGINGTON dba GEOENGINEERING WATCH

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**FILED**

NOV 18 2021

CLERK OF THE SUPERIOR COURT
BY: K. BULLARD, DEPUTY CLERK

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: <br>*(El nombre y dirección de la corte es):* Shasta County Superior Court <br>1500 Court Street, Room 319, Redding, CA 96001 | CASE NUMBER: *(Número del Caso):* <br>198510 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Samuel C. Williams, 1263 California Street, Redding, CA 96001

| DATE: <br>*(Fecha)* November 18, 2021 | Clerk, by <br>*(Secretario)* **K. BULLARD** | , Deputy <br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. [x] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)     [ ] CCP 416.60 (minor)
             [ ] CCP 416.20 (defunct corporation)     [ ] CCP 416.70 (conservatee)
             [ ] CCP 416.40 (association or partnership)     [ ] CCP 416.90 (authorized person)
             [ ] other *(specify):*
4. [ ] by personal delivery on *(date)*

Page 1 of 1

Form Adopted for Mandatory Use <br>Judicial Council of California <br>SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

# EXHIBIT C

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SHASTA
## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. Private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. You can read more information about these ADR processes and watch videos that demonstrate them at http://www.courts.ca.gov/programs-adr.htm . If the parties agree to an ADR program, the parties may file the agreement with the court for the purpose of assisting the court in determining how to proceed at the case management conference.

### Potential Advantages and Disadvantages

ADR may have a variety of advantages and disadvantages over a trial, depending on the type of ADR process used and the particular case:

#### Potential Advantages
- Saves time
- Saves money
- Gives parties more control over the dispute resolution process and outcome
- Preserves or improves relationships.

#### Potential Disadvantages
- May take more time and money if ADR does not resolve the dispute
- Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable.

### Most Common Types of ADR

**Mediation** – A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners.

**Settlement Conferences** – A judge helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Neutral Evaluation** – The parties briefly and informally present their facts and arguments to a neutral person called an "evaluator", who is often an expert in the subject matter of the dispute. The evaluator does not decide the outcome of the dispute, but helps the parties to do so by giving them a non-binding opinion about the strengths, weaknesses, and likely outcome of their case. Depending on the neutral evaluation program and the parties' wishes, the evaluator may then help the parties try to negotiate a settlement. Neutral evaluation may be appropriate if the parties want a neutral person's opinion about how

Information Sheet
Shasta County Superior Court
LF-CIV-103 [rev March 28, 2013]

ALTERNATIVE DISPUTE RESOLUTION
(ADR) INFORMATION PACKAGE

Page 1 of 2

the case might be resolved, if the primary dispute is the amount of damages, or if there are technical issues that the parties would like a neutral expert to help resolve.

Arbitration – The parties present evidence and arguments to a neutral person called an "arbitrator" who then decides the outcome of the dispute.  Arbitration is less formal than a trial, and the rules of evidence are usually relaxed.  If the parties agree to *binding arbitration*, they waive their right to a trial and agree to accept the arbitrator's decision as final.  With *nonbinding arbitration*, any party may reject the arbitrator's decision and request a trial.  Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time and expense of a trial, or want an expert in the subject matter of the dispute to make the decision.

## Selecting an ADR Program and Neutral

Selecting an ADR program and neutral are important decisions.  Be sure to learn about the rules of any program and the qualifications of any neutral you are considering, and about their fees.

## Shasta County Superior Court ADR Programs

When a civil case is set for trial the judge also will set a settlement conference date approximately six weeks before the trial date.  The judge assigned to the case will assist the parties in attempting to arrive at a negotiated resolution.

Shasta County Superior Court does not offer mediation, neutral evaluations, or arbitrations.

Private ADR Providers – To find a private ADR program or neutral evaluator, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial.  ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process.  If you do not already have an attorney, the California State Bar or the Shasta-Trinity Counties Bar Association may assist you in finding an attorney.  Information about obtaining free and low cost legal assistance is also available on the California Courts website at http://courts.ca.gov/selfhelp.htm .

Information Sheet
Shasta County Superior Court
LF-CIV-103 [rev March 28, 2013]

ALTERNATIVE DISPUTE RESOLUTION
(ADR) INFORMATION PACKAGE

Page 2 of 2

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SHASTA

CASE NO.: **198510**

NOTICE OF 1) ALL PURPOSE ASSIGNMENT,
2) MANDATORY SETTLEMENT
CONFERENCE AND 3) TRIAL

# INSTRUCTIONS – READ IMMEDIATELY!

## ORDER OF ASSIGNMENT

This action is assigned to the ☐ Hon. Stephen H. Baker / ☐ Hon. Tamara L. Wood for all purposes pursuant to Local Rule 3.02 of the Shasta County Superior Court.

## MANDATORY SETTLEMENT CONFERENCE DATE

A Mandatory Settlement Conference will be conducted in this action on Monday/Tuesday _____ at 1:30 p.m. in Department ☐ 3 / ☐ 8, located at 1500 Court Street, Redding, California 96001. All parties to this action are required to appear at the Settlement Conference.

The parties are ordered to comply with California Rules of Court, Rule 3.1380 relating to settlement conferences. Pursuant to Rule 3.1380(b), this court finds good cause is deemed to have been shown to excuse from attendance at settlement conference claims persons whose offices are more than 100 miles from the courthouse.

## TRIAL DATE

This matter is set for Trial on Tuesday/Wednesday, _____ at 8:45 a.m. in Department ☐ 3 / ☐ 8, located at 1500 Court Street, Redding, CA 96001.

## REQUIREMENT FOR SERVING THIS NOTICE

Plaintiff shall serve this notice on each defendant at the time of service of the complaint and on all intervenors and interpleaders within 10 days of service on plaintiff of complaints in intervention or interpleader. All cross-complainants shall serve this notice on each cross-defendant at the time of service of the cross-complaint.

IF YOU ARE A DEFENDANT OR CROSS-DEFENDANT, YOU HAVE BEEN SERVED WITH OTHER DOCUMENTS ALONG WITH THIS NOTICE. UNDER THE LAW, THOSE OTHER DOCUMENTS REQUIRE YOU TO TAKE ACTION PROMPTLY TO PRESERVE YOUR RIGHTS. PLEASE REVIEW THOSE MATERIALS IMMEDIATELY. THE REQUIREMENTS SET FORTH IN THIS NOTICE AND THE SETTLEMENT CONFERENCE AND TRIAL DATE SCHEDULED IN THIS NOTICE ARE SEPARATE AND ARE IN ADDITION TO THOSE CONTAINED IN THE OTHER DOCUMENTS WHICH YOU HAVE RECEIVED.

Dated: January 1, 2021

_Monique McKee_
Monique D. McKee, Presiding Judge

I CERTIFY THAT A COPY OF THIS DOCUMENT WAS PROVIDED TO THE PLAINTIFF ON **NOV 0 5 2021** BY: _____, DEPUTY CLERK

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SHASTA

CASE NO.: **198510**

NOTICE OF 1) ALL PURPOSE ASSIGNMENT,
2) MANDATORY SETTLEMENT
CONFERENCE AND 3) TRIAL

## INSTRUCTIONS – READ IMMEDIATELY!

### ORDER OF ASSIGNMENT

This action is assigned to the ☐ Hon. Stephen H. Baker / ☐ Hon. Tamara L. Wood for all purposes pursuant to Local Rule 3.02 of the Shasta County Superior Court.

### MANDATORY SETTLEMENT CONFERENCE DATE

A Mandatory Settlement Conference will be conducted in this action on Monday/Tuesday _____ at 1:30 p.m. in Department ☐ 3 / ☐ 8, located at 1500 Court Street, Redding, California 96001. All parties to this action are required to appear at the Settlement Conference.

The parties are ordered to comply with California Rules of Court, Rule 3.1380 relating to settlement conferences. Pursuant to Rule 3.1380(b), this court finds good cause is deemed to have been shown to excuse from attendance at settlement conference claims persons whose offices are more than 100 miles from the courthouse.

### TRIAL DATE

This matter is set for Trial on Tuesday/Wednesday, _____ at 8:45 a.m. in Department ☐ 3 / ☐ 8, located at 1500 Court Street, Redding, CA 96001.

### REQUIREMENT FOR SERVING THIS NOTICE

Plaintiff shall serve this notice on each defendant at the time of service of the complaint and on all intervenors and interpleaders within 10 days of service on plaintiff of complaints in intervention or interpleader. All cross-complainants shall serve this notice on each cross-defendant at the time of service of the cross-complaint.

IF YOU ARE A DEFENDANT OR CROSS-DEFENDANT, YOU HAVE BEEN SERVED WITH OTHER DOCUMENTS ALONG WITH THIS NOTICE. UNDER THE LAW, THOSE OTHER DOCUMENTS REQUIRE YOU TO TAKE ACTION PROMPTLY TO PRESERVE YOUR RIGHTS. PLEASE REVIEW THOSE MATERIALS IMMEDIATELY. THE REQUIREMENTS SET FORTH IN THIS NOTICE AND THE SETTLEMENT CONFERENCE AND TRIAL DATE SCHEDULED IN THIS NOTICE ARE SEPARATE AND ARE IN ADDITION TO THOSE CONTAINED IN THE OTHER DOCUMENTS WHICH YOU HAVE RECEIVED.

Dated: January 1, 2021

Monique D. McKee, Presiding Judge

I CERTIFY THAT A COPY OF THIS DOCUMENT WAS PROVIDED TO THE PLAINTIFF ON **NOV 0 5 2021** BY: _____, DEPUTY CLERK

# EXHIBIT D

```
                              SHASTA COUNTY COURTS                  PAGE   1
DATE 2021-12-17      CASE#: SC RD CV-PO-21-0198510-000             TIME 18:49

TYPE: PERSONAL INJURY OTHER          STATUS: PENDING
     WIGINGTON VS. MACMARTIN

        ----------JUDGE -----------
CURRENT: WOOD, TAMARA L.
                                     ------------ATTORNEYS-------------
PL 001: WIGINGTON, DANE              WILLIAMS, SAMUEL C.
    DB : GEOENGINEERING WATCH
             VS.

DF 002: MACMARTIN, DOUGLAS             NONE
    FK : MACMYNOWSKI, DOUGLAS
-----------------------------------------------------------------------
FILING                     PROCEEDINGS
DATE      EVENT        COMMENT            EVENT DATE

11/05/21 INITIATE CIVIL COMPL

11/05/21 CASE COVER SHEET

11/05/21 COMPLAINT

11/05/21 ASSIGN JUDGE TO CASE

11/05/21 SETTLEMENT CONF     SCJ            8/08/22 13:30

11/05/21 COURT TRIAL         SCJ            9/27/22  8:45

11/05/21 SUMMONS ISSUED-FILED

11/18/21 AMENDED SUMMONS ISS

12/03/21 INVALID PROOF OF SER

12/14/21 INVALID PROOF OF SER
```